Argued and submitted September 14, 2009, decision of Court of Appeals and judgments of circuit court reversed as follows: judgment of conviction against defendant for attempted first-degree sexual abuse of victim T reversed, and case remanded to circuit court for entry of a judgment of acquittal on that charge; judgments of conviction against defendant for first-degree sexual abuse of victims SM and SO, and judgment of conviction against defendant for attempted first-degree sexual abuse of victim W reversed, and case remanded to circuit court for further proceedings June 4, 2010

STATE OF OREGON,
*Respondent on Review,*

*v.*

TYLER JAMES LUPOLI,
*Petitioner on Review.*

(CC C052106CR, C053594CR;
CA A132083, A132084;
SC S056477)

234 P3d 117

Robert Rosenthal, New York, argued the cause and filed the brief for petitioner on review. With him on the brief were Edward H. Talmadge and Tracy M. McGovern of Frohnmayer, Deatherage, Jamieson, Moore, Armosino & McGovern, P.C., Medford.

Anna Marie Joyce, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

GILLETTE, J.

## GILLETTE, J.

This criminal case presents two issues. The first is whether certain expert witnesses at trial improperly "vouched" for the veracity of children who allegedly had been victims of sexual abuse. The alleged vouching occurred when the experts testified generally about characteristics of truthful and untruthful children and then testified that statements of the children in question displayed the characteristics of truthful children and lacked characteristics indicative of suggestion, influence, or fantasy. The second issue is whether the trial court erred in denying defendant's motion for judgment of acquittal on the charge involving one of the alleged victims. The Court of Appeals affirmed defendant's convictions without opinion. *State v. Lupoli*, 219 Or App 665, 185 P3d 571 (2008). For the reasons that follow, we reverse the decision of the Court of Appeals and the judgment of the circuit court, and we remand the case to the circuit court.

The following facts are undisputed. At the time of the events that led to the charges against him, defendant was 19 years old and had been working at a fitness club in Hillsboro, Oregon, for about two months, selling club memberships. By his own admission, defendant did not enjoy sales and was not a very good salesman. He took frequent breaks from his sales calls to wander around the club, doing things that were not part of his job, including, among other things, chatting with other employees. One of the people defendant often visited was a woman who worked in the club's daycare facility, which was called the Kids Club.[1]

The Kids Club was a room with an open entryway, windows from the interior of the club through which parents could see their children, and a surveillance video camera that recorded what went on in the room. The fitness club maintained certain employee-child ratios in the Kids Club at all times. For children over 18 months old, the required ratio was one trained employee per 10 children. For children under 18 months of age, the ratio was one to three. Other club personnel who were merely visiting the Kids Club, as defendant

---

[1] Employees other than those hired to work in the Kids Club were not supposed to be in that facility, but that rule was not enforced.

often did, did not count toward those ratios. As a result, there were always several club employees in the room whose job it was to watch over the children, and other club employees frequently were present as well.

Based on accusations of misconduct in the Kids Club alleged to have occurred over a several-week period, defendant was charged with sexually abusing, or attempting to sexually abuse, six children. This case involves charges respecting four of the victims.[2] The first victim, SM, an eight-year-old, had told her mother in July 2005 that she did not want to go to the daycare facilities at the fitness club. Nonetheless, her mother dropped her off and went to work out. The mother checked in on her about a half an hour later, and SM was watching television. The mother continued to work out for another 20 minutes and then picked the child up. SM did not immediately tell her mother about anything that had happened during her time in the Kids Club, nor had she complained to anyone working there. As they were leaving, however, SM told her mother that she did not want to come back to the Kids Club because she did not like it there. According to the mother, SM pointed at defendant and stated that he had said "weird stuff" to her. When questioned, SM elaborated that defendant had asked her what her underwear looked like. SM and her mother then reported the incident to the club's management. In those initial conversations, SM did not state that defendant had touched her. However, while in the car on the way home and in response to further questioning by her mother, SM told her mother that defendant had touched her underpants. The mother called the police.

A police officer, Mastrisciano, came to the child's home later that evening. On questioning, SM recounted her conversation with defendant and, eventually, told the officer that defendant had pulled at her underwear and touched her. As a result, SM was sent for an examination at CARES Northwest, a clinic that evaluates children who may have been sexually abused. A nurse, Avila, conducted a physical examination, which did not reveal physical evidence of sexual abuse. Avila then diagnosed SM with "sexual abuse"

---

[2] Defendant was acquitted of the charges respecting two other alleged victims; therefore, we do not describe the facts surrounding those counts.

based on SM's allegations, and referred SM to a CARES social worker, Findlay, for further questioning. SM told Findlay that defendant had asked to see her underwear and had touched her twice.

Thereafter, Mastrisciano obtained copies of the Kids Club surveillance videotapes for the month and a half before the incident that SM described. In all of the videotapes, other adults were in the room when defendant was there. None of the surveillance videotapes, including the one from the day on which SM claimed that defendant had touched her, showed defendant touching a child or looking at a child's underwear.[3] Nonetheless, Mastrisciano identified as potential victims all girls with whom defendant had had direct, one-to-one personal interaction. Mastrisciano then began contacting the parents of those children.

As relevant here, about two weeks after SM's initial complaint, Mastrisciano contacted the parents of three-year-old W. Mastrisciano informed them of his investigation and told them that their daughter could possibly have been the victim of some inappropriate conduct by defendant at the Kids Club. W's mother reported to Mastrisciano that, some time previously, W had told her that a "boy" at the Kids Club had tried to lift up her skirt, but W's mother had believed that the "boy" was another child at the daycare facility. When the accusations against defendant came to light, both Mastrisciano and W's mother assumed that, in fact, W had been referring to defendant. Mastrisciano, on being told about W's story, assumed defendant was the "boy." He conducted no investigation into whether W could have been talking about another child; he neither asked W about it nor viewed any of the surveillance tapes to confirm her report. W was taken to a social worker and "play therapist," Moussa, for evaluation. W eventually confirmed to Moussa, in response to Moussa's direct question, that defendant had lifted her skirt and touched her in the vaginal area.

---

[3] The videotapes had no audio portion. The tapes actually consisted of a series of still photographs taken at close intervals—about one photo every second. The videos were taken from an upper corner of the room. Defendant's back was to the camera most of the time and, even when it was not, defendant's eyes were not visible.

Mastrisciano next contacted the parents of a five-year-old child, SO, and told them what SM claimed had happened to her at the Kids Club.[4] In response, SO's father told Mastrisciano that, about a month earlier, he had taken SO to the Kids Club and, when he later picked her up, she complained that a "big boy" had wanted to "play, play, play," and that she did not want to play with him. Later that evening, when SO's mother came home from work, SO told her the same thing. In response to her mother's questioning, SO told her mother that the boy had asked to see her underwear and had asked to see her vagina, and that she had lifted her dress and pulled her underpants aside to expose her vaginal area.[5] SO then went through the same CARES process that SM had been through: She underwent a physical examination, which did not reveal physical evidence of sexual abuse. The examining physician, Heskett, diagnosed SO with "sexual abuse." Social worker Findlay then questioned SO further. When talking to Findlay, SO stated that defendant had touched her near her vagina.

Finally, as relevant here, Mastrisciano contacted the parents of three-year-old T. T's mother met Mastrisciano at the police station. Mastrisciano explained the allegations that, by then, had been made against defendant and showed T's mother a surveillance videotape of her daughter with defendant. Subsequently, T also was interviewed by Findlay at CARES. T never indicated to the police, her parents, Findlay, or anyone else that defendant had ever touched her or tried to look at her underwear. A videotape from Kids Club showed defendant in close physical proximity to T on one occasion.

Defendant was charged with two counts each of first-degree sexual abuse with respect to SM and SO, one count of first-degree sexual abuse with respect to W, and one count of attempted first-degree sexual abuse with respect to T.

---

[4] The case had received considerable media attention by that point.

[5] SO's mother had told her to tell the "teacher" if anything like that happened, but neither she nor SO's father called the police or contacted the fitness club management or Kids Club about SO's story. In fact, SO's father took her back to the Kids Club about 20 times in the month between SO's first mention of the boy who wanted to "play, play, play" and Mastrisciano's communication to him about the charges against defendant.

At defendant's trial, the state presented, among other things, the testimony of the health care professionals who evaluated SM, SO, and W.[6] Those health care professionals testified that, in their respective opinions, the children whom they evaluated had been sexually abused. Avila, for example, testified that she diagnosed eight-year-old SM as having been sexually abused because:

- "Her disclosures * * * were very clear and spontaneous. They were appropriate for the age that she was. They didn't sound rehearsed, they sounded like things she just said."

- "She was consistent. She had said the same type of thing before to her parents, I guess."

- "[H]er physical exam was consistent with what she said happened. There weren't any signs, but you wouldn't expect there to be. * * * [S]he was touched and—with a hand, and touching doesn't leave any marks."

- "[T]he manner in which [SM] told her story was pretty compelling. She just had a real clear change in her demeanor."

- "[J]ust the way she told her story was very compelling, and that just makes it—it just was—it had an effect."

Avila also testified that she saw multiple instances of "idiosyncratic detail" in SM's statements, which Avila described as

"spontaneous detail that you wouldn't otherwise get, * * * things that if you were making up a story, you might not put that kind of detail in it."

Avila stated that, in SM's story,

"there was a lot of little details that were involved in the way the story was told. * * * I mean it was really quite descriptive."

---

[6] As we discuss in detail below in addressing defendant's contention that the evidence was insufficient to support his conviction for attempted first-degree sexual abuse of T, the only evidence in the record that concerned the allegations respecting T was Mastrisciano's and her mother's testimony, a surveillance videotape showing defendant sitting close to T, and defendant's acknowledgement on cross-examination that the videotape showed that, at certain points, he had been sitting close enough to T to look at her underwear and to touch her. No health care professional mentioned T's name at the trial.

Finally, Avila testified that she and social worker Findlay

"were in agreement. * * * We both felt quite certain that when you look at the things that you look at that make you think that a kid is telling it like it is, they were all there. They were all there, and we both agreed[.]"[7]

Heskett testified that she diagnosed five-year-old SO as having been sexually abused because

"the child made consistent statements in a developmentally appropriate way, she's only five years old, consistent with abuse. Her examination was—did not show signs of abuse. * * * [B]ased on those things, I came to the diagnosis."

Heskett also described the things she looked for in SO's statements to arrive at her diagnosis:

- "We look to make sure that the child's statements are developmentally appropriate. It would be very worrisome or concerning * * * if I had a child who at five was using terminology or expressing things with phrases that would not be expected to come from a five-year-old. * * * [SO] seemed developmentally appropriate to me[.]"

- "In general, [peripheral details are] one of the things that's important in the sense that the child can give as much detail about the entire reported or alleged incident as possible. * * * [SO] was very clear-cut in telling us [details]."

When asked whether anything about SO's affect would raise concerns of whether to rely on what she had said, Heskett testified,

"For a five-year-old child, she actually seemed to be very appropriate. She did not seem to be overly anxious, overly timid, overly afraid."

Heskett also testified that nothing about SO's emotional state gave rise to concerns about her reliability. Heskett listed specifically what led her to diagnose SO with sexual abuse:

"The combination of her statements, as well as the fact that her physical findings fit with her statements. She did not

---

[7] The trial court sustained defendant's objection to that last statement and instructed the jury to disregard it.

have any signs of abuse, but I would not have expected any based on her statements. * * * It was the comments that she made[.] * * * It was the fact that she had options or opportunities to perhaps change her history or say that she had been touched in other places, and she remained fairly consistent—not fairly, she remained consistent in where she was touched."

Finally, Heskett testified that, in concluding that SO had been sexually abused, she relied on the absence of "risk factors," *i.e.*, ways in which a child would gain "inappropriate sexual knowledge," such as exposure to adult pornography.

Findlay also testified about how he had reached his conclusions respecting SO. He testified that, when interviewing children for CARES, he looks for certain characteristics in children's statements to determine, for one thing, whether they are suggestible:

"[S]uggestibility refers to sometimes a child's statements where [they] can be impacted by the way in which a question is asked. * * * Kids that are highly suggestible tend to want to please an adult. They'll answer 'yes' to almost all of your questions. * * * They often also kind of parrot your words. They may use words that are not—sound like words that are from kids."

Specifically with respect to SO, Findlay testified,

"I did not find her, you know, very suggestible. She answered 'no' to a lot of questions. She kind of corrected herself at one point. She didn't appear that suggestible to me."

Moussa, the social worker and play therapist, testified about how she had reached her conclusions with respect to three-year-old W. Moussa testified that, after she explained to W who she was, Moussa "described that the inappropriate situation that [W] had been in is that she had had her skirt lifted up at the 24-Hour Fitness, and [W] nodded, yes." At that point, according to Moussa, W became anxious and avoided eye contact. Moussa then testified that, before having been asked the question about the lifting of the skirt,

"My assessment was that [W] was presenting as developmentally appropriate in her demeanor, in her verbal language presentation, her general fund of knowledge, doing a basic mental status, meaning that she would interact with me, she could speak clearly, she could have some play interactions that let me know developmentally she was on track.

"Also that there was a significant affect change when I did make statements about the nightmares and the lifting of her skirt at the gym."

Defendant objected to all the foregoing testimony concerning SM, SO, and W, both through specific and also through continuing objections, on the ground that it amounted to improper vouching by one witness for the credibility of another. He argued that the various statements informed the jury that there are particular indicia of truthful statements by children and that the children's statements as reported in this case exhibited those indicia. The trial court overruled those objections, except the objection to Avila's statement that she and Findlay "both felt quite certain that when you look at the things that you look at that make you think that a kid is telling it like it is, they were all there. They were all there, and we both agreed." On that occasion, the court sustained the objection and instructed the jury to disregard the statement.

Defendant also moved for a judgment of acquittal on the charge against him involving T.[8] He argued that the only evidence against him concerning T was the surveillance videotape, that that tape did not in any way establish defendant's intent to commit the crime of attempted sexual abuse, and, therefore, that the evidence was insufficient to convict him of attempted sexual abuse of T. The trial court denied the motion. Ultimately, defendant was convicted on all counts involving SM, SO, and T. With respect to W, defendant was convicted of the lesser-included offense of attempted first-degree sexual abuse. Defendant appealed his convictions to the Court of Appeals, which, as noted, affirmed without opinion. We allowed defendant's petition for review.

---

[8] Defendant also moved for judgments of acquittal on other charges, concerning other victims. The trial court's ruling denying the motion with respect to the other charges is not at issue in this court.

After this case was briefed in this court, this court held in a separate case that a statement from an expert that, in the expert's opinion, a child had been sexually abused was inadmissible in the absence of physical evidence of abuse, because it does not tell the jury anything that the jury could not have determined on its own, and, therefore, the probative value of any such testimony is outweighed by the danger of unfair prejudicial effect under OEC 403. *State v. Southard*, 347 Or 127, 142, 218 P3d 104 (2009). Defendant in this case objected at trial to the admission of the health care professionals' diagnoses of sexual abuse; the trial court overruled those objections. However, defendant did not assign error to those rulings in the Court of Appeals, and he does not now argue that this court should apply *Southard* to reverse the decision of the trial court. Accordingly, we do not consider whether the trial court erred in permitting Avila, Heskett, or Findlay to testify about their sexual abuse diagnoses. That does not end this case, however, because defendant did make other, timely objections to the various expert witnesses' opinion testimony, which he preserved for review. And, as we shall explain later, we find a number of those objections to be well taken.

Defendant first argues that the testimony of the health care workers quoted above amounted to impermissible comments by one witness on the credibility of another, that the trial court erred in failing to sustain his objections on that ground, and that the error was not harmless. He therefore asks this court to reverse his convictions on the charges involving SM, SO, and W.

The law applicable to this issue is well understood. This court has long held that one witness may not give an opinion on whether he or she believes another witness is telling the truth. *See State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983) ("We expressly hold that in Oregon a witness, expert or otherwise, may not give an opinion on whether [the witness] believes a[nother] witness is telling the truth."). Applying that principle is a straightforward matter when one witness states directly that he or she believes another witness, or that the other witness is honest or truthful. However, statements that fall short of such overt vouching also may be impermissible.

For example, in *State v. Milbradt*, 305 Or 621, 756 P2d 620 (1988), the defendant was charged with sexual misconduct involving two severely mentally challenged women. Both were deemed competent to testify at the defendant's subsequent trial, and both did testify against the defendant. During the trial, it was clear that both women had difficulty recalling and relating any specific details about the alleged crimes. Their complaints were uncorroborated by any witness or physical evidence. The defendant denied any involvement in the alleged crimes.

The state offered the testimony of a psychologist who had examined one of the women. Among other things, the prosecutor asked the psychologist if, in his experience, he had found that there were certain indicators of deception. The psychologist stated that there were. The prosecutor then asked if, in talking to the victim, the psychologist had seen evidence or indicators of deception. The psychologist answered,

> "I did not. She seemed to take every question and answer it as she was, answer spontaneously on the moment with no indication of hesitation, or figuring out what the best answer might be. You know, she would just blurt things out, which is unpremeditated response. So, kind of a very fresh and spontaneous approach to me.
>
> "* * * * *
>
> "I did not see any evidence of [purposefully deceiving or changing things]. * * * But it seemed to me to be no attempt on her part to change things around, say things differently than the way she felt. And she said things with an exuberance, and emphasis, like, you know, she wanted to do well, and say the answer, and do the right thing, and here it is, you know. None of the mannerisms of someone who is cagey and guarded and careful.
>
> "* * * * *
>
> "Again, I find her condition of her mental defect as directly related to rendering her unsophisticated to either plan a systematic or motivated deception, or carry it through. She was so spontaneous if she, this is my opinion, if she lied, that she would trip herself up five minutes later, you know.
>
> "* * * * *

"I would not think she would have the motivation to betray somebody. * * *."

305 Or at 626-27.

The defendant unsuccessfully objected to the foregoing testimony on the ground that witness credibility is an impermissible area of comment by a psychotherapist. This court held that that objection should have been sustained:

"We have said before, and we will say it again, but this time with emphasis—we really mean it—*no psychotherapist may render an opinion on whether a witness is credible in any trial conducted in this state*. * * * An opinion that a person is not deceptive, could not lie without being tripped up, and would not betray a friend (to wit: the defendant) is tantamount to the same thing."

*Id.* at 629-30 (emphasis in original). Moreover, even though the trial court had given a limiting instruction, this court held that the instruction was insufficient to mitigate the harm, and it reversed the defendant's convictions. The court stated that

"[t]he proffered evidence directly reflected upon the credibility of the testimony of the state's key witnesses, a matter to be assessed by the jury. * * * [T]he inadmissible testimony was received and the jury heard it. The trial judge did not tell the jury to disregard the expert's opinion. Its admission and the trial judge's failure to instruct the jury to disregard the testimony concerning [the psychotherapist's] credibility evaluation of one of the state's key witnesses were reversible errors."

*Id.* at 632.

*State v. Keller*, 315 Or 273, 844 P2d 195 (1993), also is instructive. There, the defendant had been convicted of sexually abusing a five-year-old child to whom the defendant's wife provided in-home daycare. The child had told her mother that the defendant, who had been left alone with the children for about five minutes before the child's mother had arrived to pick her up, had, in those five minutes, touched her genital area. The child was examined by a doctor, who found no physical evidence of abuse, and then received a CARES evaluation.

A CARES doctor who had watched the interview with the child was called as a witness for the prosecution at the defendant's ensuing trial. The doctor testified about the materials that she had reviewed and the process that she had used to arrive at her conclusions about the child. Among other things, the doctor testified that the interviewer's job, in interviewing the child,

> "was to talk to the child about the alleged incident of possible sexual abuse, and to try to gather as much information so we can reach a conclusion about whether this child has been coached, been led, is fantasizing, or is indeed describing something that happened to her own body."

*Id.* at 277. The doctor agreed that those were things that she herself looked for when formulating a diagnosis of child sexual abuse.

Eventually, the doctor testified about her diagnosis that the child had been sexually abused:

> "I felt that [the child] had given a clear history of an episode of sexual touching which had happened to her own body. There was no evidence of leading or coaching or fantasizing."

*Id.* at 278. The prosecutor then asked the doctor what she looked for to determine that the child had not been led or coached. This court described the doctor's response as follows:

> "In reply, the witness described to the court the types of behavioral evidence on which she normally relied to determine whether a child had been coached: a 'rote' style of recitation by a child, a child's ability to supply 'peripheral' details of the alleged incident, a child's tendency to correct the interviewer about the facts, and various emotional responses by the child. She then stated that, during the interview of the child in this case, the child 'was obviously telling you about what happened to her body' and was 'remembering what happened.' "

*Id.* at 278-79. The defendant unsuccessfully objected to the foregoing testimony on the ground, among others, that the doctor's testimony amounted to offering her opinion on the truthfulness of the child's statements in the interview.

On review, this court repeated the rule that, in Oregon, one witness may not give an opinion on whether that witness believes another witness is telling the truth. The court continued:

> "Furthermore, this rule applies whether the witness is testifying about the credibility of the other witness in relation to the latter's testimony at trial or is testifying about the credibility of the other witness in relation to statements made by the latter on some other occasion or for some reason unrelated to the current litigation."

*Id.* at 284-85. The court concluded that the doctor's testimony that "there was no evidence of leading or coaching or fantasizing" during the child's CARES interview, and that the "child was obviously telling you about what happened to her body" both amounted to testimony that the child was credible. *Id.* at 285. The court held that the trial court erred in failing to strike that testimony. *Id.*

With the foregoing discussion of law in mind, we turn to a review of the witnesses' testimony about each of the victims, beginning with SM.

■ Each of Avila's statements about SM that we have set out above was offered to explain Avila's diagnosis of SM as having been the victim of child sexual abuse. Ordinarily, an expert witness may explain the basis for the expert's diagnosis, as long as the diagnosis itself is also admissible. As we already have noted, in this court, defendant has not argued that Avila's diagnosis of child sexual abuse was inadmissible. Defendant, however, always has maintained that the testimony that Avila offered in explaining how she arrived at that diagnosis was inadmissible. Avila's statements must be analyzed with due regard for the context in which they were made, even though defendant does not now complain that the diagnosis itself is inadmissible. Said another way, defendant's failure to raise the same objection that prevailed in *Southard* does not prevent us from considering the import of Avila's explanatory statements, given their context. Here, that context was a child sexual abuse diagnosis based ultimately and only (given the lack of physical evidence of abuse) on whether Avila believed what SM told her.

So viewed, we conclude that, on the whole, Avila's testimony was inadmissible because it constituted vouching. To be sure, discrete portions of what Avila said might be admissible in many circumstances, and perhaps even in this case. For example, Avila's testimony that what SM said was developmentally appropriate for her age is the kind of expert opinion that can assist a jury and ordinarily would be admissible. So, too, might be testimony describing SM's demeanor and changes in demeanor, and the description of SM as having included spontaneous and descriptive details in her statements. The problem here, however, is that those otherwise permissible or potentially permissible portions of Avila's testimony were inextricably bound up with portions that constituted clear "vouching." Avila's diagnosis, given the lack of physical evidence of abuse, necessarily was based on her assessment of the child's believability. When Avila then was asked the basis for her diagnosis, she was implicitly declaring, with each statement and description, why she had found SM to be credible. She did so explicitly as well, as when she explained that "the manner in which [SM] told her story was pretty compelling" and that "it had an effect" on her forming her diagnosis. Even if there were parts of Avila's testimony that might be admissible if offered in support of some other kind of diagnosis, or if offered to otherwise assist the jury, instead of to explain the expert's credibility-based opinion, here, none of Avila's testimony can be meaningfully separated from the context of which it was a part. We therefore conclude that the trial court erred in admitting the challenged testimony.

■ The same is true of Heskett's and Findlay's testimony about their conclusions that SO had been sexually abused, which we also quoted earlier. Again, in the abstract or in some other context, Heskett's testimony as to whether SO's statements were developmentally appropriate or her observations of SO's physical characteristics and demeanor ordinarily would not be, in and of themselves, impermissible vouching. The same is true of Findlay's general description of the circumstances that can point to a child's suggestibility or the possibility that the child has been coached. But, also again, the context differentiates that testimony in this case

from cases in which it might otherwise be admissible. That context is their ultimate individual expert opinions, which we held in *Southard* were not admissible. As with Avila's testimony, we conclude that Heskett's and Findlay's testimony constituted impermissible vouching, and defendant's objections to the testimony should have been sustained.

We turn to the challenged testimony concerning victim W. Moussa's testimony concerning W suffered from the same defect. It is true that Moussa's testimony concerning W being developmentally appropriate, and her description of W's affect change, could be admissible in many circumstances. But that was not true here, because Moussa's testimony was inextricably bound up with her conclusion that W was sexually abused. Defendant's objections to her testimony as impermissible vouching were well taken.

The state also contends that, even if Avila, Heskett, and Findlay improperly commented on the credibility of SM and SO, the similar objection to Moussa's testimony about W was not well taken for another reason. The state argues that

> "the prohibition against one witness testifying about whether another witness's testimony or out-of-court statements are true or deceptive is limited to the testimonial evaluation of *another trial witness's* statement. * * * A comment that purports to evaluate the deceptiveness or truthfulness of a non-witness's out-of-court remarks is not subject to exclusion under this principle."

(Emphasis in original.) Therefore, the state argues, because W did not testify at the trial, defendant's improper vouching argument fails as it applies to W's statements.

In support of its position, the state relies on *State v. Odoms*, 313 Or 76, 829 P2d 690 (1992). In that case, a woman told the police that the defendant had kidnapped her and

then raped and sodomized her. Two police officers questioned the defendant. The defendant initially denied knowing the woman, and then eventually admitted that he knew her but maintained that his sexual encounters with her were entirely consensual. At the defendant's subsequent trial, only one of the police officers testified. That officer recounted the conversation that he and the other officer had had with the defendant, including reporting that the other officer had told the defendant that he, the other officer, did not think that a person would simply make up allegations against another person if there were not something to them. The defendant unsuccessfully objected to that testimony as improper opinion evidence about the complaining witness's credibility. During the trial, the complaining witness testified for the state; the defendant and the officer who made the challenged statement did not testify. The defendant ultimately was convicted of the charged offenses.

On review, in considering the issue, this court in *Odoms* first discussed its earlier opinion in *Middleton*, in which the court held that one witness, expert or otherwise, may not give an opinion on whether he believes another witness is telling the truth. *Odoms*, 313 Or at 82. The court in *Odoms* distinguished *Middleton*, stating, "[T]he point of *Middleton* was only to preclude the testimony by *one trial witness* about whether *another trial witness* is telling the truth." *Id.* (emphasis in original). On the other hand, the court held, "a relevant out-of-court statement, recounted at trial, generally may not be excluded merely because it is phrased in the form of an opinion." *Id.* at 83. Explaining that holding, the court stated that the rule against opinion evidence fosters concrete answers by witnesses, but has no sensible application to statements made out of court. *Id.*

Notwithstanding the court's emphasis on "trial witnesses," it is evident from the foregoing that neither *Odoms* nor *Middleton* is apposite.[9] Neither case even suggests, much

---

[9] In fact, in *Odoms*, the purportedly vouching witness did not testify, but the complainant did. And in *Middleton*, the main issue before the court was whether an expert could testify that typical child sexual abuse victims deny or recant abuse allegations when a family member is the alleged abuser. The court held that that testimony, which did not directly express an opinion on the truth of the victim's

less compels, the conclusion that a trial witness should be permitted to give an opinion that a nonwitness complainant was telling the truth. In fact, all of the reasons for preventing one witness from vouching for another witness's credibility at trial apply with equal or greater force when the nonwitness is an unavailable complainant. In that circumstance, the defendant does not have the ability to confront the complainant or to impeach the accusations against him or her. Permitting a trial witness to vouch for the credibility of the complainant in such a situation would interfere with the ability of the trier of fact to determine the truth of the allegations, and would be highly unfair to the defendant.[10]

In this case, the complainant, W, did not testify against defendant because she was too young; defendant, therefore, had no opportunity to confront her. Defendant denied the accusations that she had made, and the surveillance videotape was inconclusive. That meant that the only information presented to the jury in support of W's allegations came through the testimony of the adults who had talked to her. Moussa testified that W was "developmentally appropriate in her demeanor, in her verbal language presentation, her general fund of knowledge," that she interacted with Moussa, that she spoke clearly, and that "developmentally she was on track," but that "there was a significant change of affect when I did make statements about the nightmares and with the lifting of her skirt in the gym." That expert testimony, like Avila's, Heskett's, and Findlay's, may have been admissible in the abstract, or in some other context, but in this context it was not. The trial court erred in failing to sustain defendant's objection to Moussa's vouching testimony.

---

testimony, explained to the jury the emotional underpinnings of the witness's "superficially bizarre behavior," *Middleton*, 294 Or at 436, and was admissible because it would help the jury "make a more informed decision in evaluating the credibility of a testifying child." *Id.* at 437.

[10] The use of expert testimony respecting the specific question whether some other person is telling the truth raises questions concerning a witness' qualifications, the helpfulness of the opinion, and the likelihood of undue confusion of issues or prejudice to the other party. *See generally* David H. Kaye, David E. Bernstein, and Jennifer L. Mnookin, *The New Wigmore: Expert Evidence* § 1.5, 23-25 (2004) (examining rule and its rationale).

Based on the foregoing analysis, we hold that the trial court erred in admitting the specified expert opinions concerning victims SM, SO, and W.[11] Defendant's convictions concerning those victims must be reversed, and the case remanded to the trial court for a new trial. We turn at last to the somewhat different issues surrounding defendant's conviction for attempted sexual abuse of T.

■■■ Defendant argues that the trial court erred in denying his motion for judgment of acquittal on the charge concerning T. In reviewing a trial court's denial of a motion for judgment of acquittal, the court considers whether any rational trier of fact, accepting reasonable inferences and making reasonable credibility choices, could have found the essential elements of the crime beyond a reasonable doubt. *State v. King*, 307 Or 332, 339, 768 P2d 391 (1989). In so doing, the court reviews the facts in the light most favorable to the state and draws all reasonable inferences in the state's favor. *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998). For purposes of analyzing the sufficiency of the evidence, no distinction exists between direct and circumstantial evidence. *Id.* However,

> "circumstantial evidence, like direct evidence, must indicate guilt to the extent that there is no reasonable doubt of that conclusion. In deciding whether a jury issue exists, * * * inferences of innocence [must] be considered that may be drawn from the facts in evidence (as found in the State's favor) or from the paucity of such facts, and if they are sufficient to create a reasonable doubt, the case may not be submitted to the jury."

*State v. Krummacher*, 269 Or 125, 139, 523 P2d 1009 (1974).

Defendant was charged with attempted first-degree sexual abuse of T. First-degree sexual abuse is defined in ORS 163.427 as follows:

---

[11] We also conclude that the error was not harmless. We have held that a harmless error is one that has "little likelihood" of affecting the verdict. *Keller*, 315 Or at 285 (so defining harmlessness). In this case, there was no physical evidence of abuse; the children's credibility, therefore, was paramount. In that circumstance, we cannot conclude that there was "little likelihood" that the experts' testimony affected the verdict.

"(1)  A person commits the crime of sexual abuse in the first degree when that person:

"(a)  Subjects another person to sexual contact[12] and:

"(A)  The victim is less than 14 years of age[.]"

Under ORS 161.405(1), a person is guilty of an attempt to commit a crime "when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime." Defendant argues that, viewing the evidence in the light most favorable to the state and drawing all reasonable inferences in the state's favor, there was no evidence from which the jury reasonably could infer that defendant intentionally engaged in conduct that constituted a substantial step toward sexual abuse of T.

We begin by summarizing the evidence pertaining to the charge involving T. T did not testify at the trial, and, as discussed above, she never indicated to anyone that defendant had tried to touch her or had done anything to her that could be interpreted as constituting a substantial step toward sexually abusing her. Although T received a CARES evaluation, no health care professional testified about that evaluation and no documentary evidence relating to that evaluation was admitted at the trial. The state's case consisted of the testimony of T's mother and Mastrisciano, the surveillance videotape, and defendant's statements on cross-examination.

T's mother stated that T was three years old and she identified T on the videotape. She testified that she and her husband had been contacted by Mastrisciano about the allegations concerning defendant, that they met Mastrisciano at the police station, that they watched the videotape, and that she subsequently took T to CARES for an evaluation. Mastrisciano testified that he contacted T's parents. He identified T and defendant in a still photo taken from the

---

[12] "Sexual contact" is defined as "any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party." ORS 163.305(6).

videotape, and he testified that T was wearing a dress and was sitting directly across from defendant in that picture.

The surveillance videotape was played for the jury.[13] The tape shows T entering the Kids Club, where defendant is sitting on a plastic semicircular couch with his back toward the camera. T walks up to defendant and sits down beside him. When T is sitting on the couch, only the back of her head and shoulders can be seen. Defendant's back is flat against the couch, but his face is turned toward T. Defendant leans forward, and T gets up, walks in front of him, and sits on a short wall directly across from him. Defendant picks up a ball and begins to throw it back and forth with her. T comes back and sits down beside defendant again. Defendant then gets off the couch, picks up the ball, and goes to his knees on the floor in front of her. A few seconds later, defendant lowers his upper body so that his head is at the level with the seat of the couch. The frame at that moment does not show what direction defendant is looking, and it only shows the back of T's head and shoulders. A few seconds after that, defendant sits back on the couch next to T. A few seconds later, defendant again picks up the ball and turns his upper body toward T. He then moves to T's other side on the couch and lowers his head in front of hers, while she lowers her head at the same time. The camera's view of defendant's head at that point is blocked by the back of T's head. When they raise their heads two or three seconds later, defendant is holding the ball. Defendant and T lower and raise their heads once more. T again goes to the small wall across from defendant and sits down, and they begin throwing the ball back and forth again. A few seconds later, T comes back to the couch and sits down beside defendant. Then, less than nine minutes after T walked into the Kids Club, another adult comes and leads T away and defendant leaves the Kids Club.

During the state's cross-examination of defendant, defendant vigorously denied having touched any child or trying to look at her underwear, but he did admit that he was sitting next to T, that they both looked down at two points, that he was sitting close enough to T to touch her genital

---

[13] As noted, the tape consists of a series of still photographs. It includes a clock that permits time intervals to be identified. There is no audio portion.

area, and that, when he and she were looking down, he could have been looking at her lap, among many other things.

To prove that defendant committed the crime of attempted first-degree sexual abuse of T, the state had to prove beyond a reasonable doubt that defendant intended to engage in conduct that constitutes a substantial step toward subjecting T to sexual contact. ORS 163.427; ORS 161.405. If the state failed to do so, the trial court was required to grant defendant's motion for judgment of acquittal.

As discussed above, T never personally stated to anyone that defendant had done anything that could be construed as a substantial step toward subjecting her to sexual contact. Viewed in the light most favorable to the state, the surveillance videotape and defendant's testimony on cross-examination demonstrate only that defendant had the opportunity to commit the crime of first-degree sexual abuse. The tape and defendant's testimony prove that defendant sat near enough to touch T and that he looked in the direction of her lap. Proximity alone, however, is not a substantial step; instead, it is a circumstance that makes a substantial step (if one is taken) meaningful. A rational trier of fact was not entitled on this record to find beyond a reasonable doubt facts that constituted not only opportunity, but also a substantial step toward subjecting T to sexual contact.

The state argues in the alternative that defendant's conduct toward the other children constituted a pattern or practice of abuse, and therefore was admissible under OEC 404(3)[14] to establish his propensity or intent to commit the crime. In our view, however, the state's argument misses the point. To prove an attempted crime, the state must present evidence that a defendant engaged in conduct constituting a "substantial step" toward committing that crime. Even when viewed in the light most favorable to the state, however, the videotape of defendant's conduct with respect to SM, SO, and

---

[14] OEC 404(3) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

W does not show that, with respect to T, defendant had proceeded beyond having the opportunity to commit a crime to actually taking a "substantial step" toward the commission of that crime.

We hold that a rational jury could not have found beyond a reasonable doubt that defendant intended to engage in conduct that constituted a substantial step toward the commission of the crime of first-degree sexual abuse of T. We therefore hold that the trial court erred in failing to grant defendant's motion for judgment of acquittal on that count and that the Court of Appeals erred in affirming that conviction. Defendant's conviction for attempted first-degree sexual abuse of T therefore must be, and it is, reversed.

The decision of the Court of Appeals and the judgments of the circuit court are reversed as follows: The judgment of conviction against defendant for attempted first-degree sexual abuse of victim T is reversed, and the case is remanded to the circuit court for entry of a judgment of acquittal on that charge. The judgments of conviction against defendant for first-degree sexual abuse of victims SM and SO, and the judgment of conviction against defendant for attempted first-degree sexual abuse of victim W are reversed, and the case is remanded to the circuit court for further proceedings.