Submitted June 29, reversed and remanded December 15, 2010

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GEORGE DAVILIA,
*Defendant-Appellant.*

Washington County Circuit Court
C080102CR; A139939

244 P3d 855

Peter Gartlan, Chief Defender, Appellate Division, and Shawn E. Wiley, Chief Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

Following a bench trial, defendant appeals a judgment convicting him of first-degree rape, ORS 163.375, and two counts of first-degree sexual abuse, ORS 163.427. He contends that the trial court erred when, despite the absence of supporting physical evidence, it admitted a nurse practitioner's diagnosis of "highly concerning for sexual abuse." Specifically, he asserts that the admission of that diagnosis was improper because (1) the diagnosis lacked a proper foundation and was unfairly prejudicial and therefore did not meet admissibility requirements for scientific evidence and (2) the diagnosis constituted an impermissible comment on the credibility of the victim, a witness in the case. For the reasons explained below, we reverse and remand.

The following facts are undisputed. The victim, defendant's then three-year-old daughter, told a family friend that "Daddy puts his pee-pee in my pee-pee." She repeated that statement to the friend on several different occasions. The allegations were eventually reported to the police, and the victim was referred to CARES, where she was examined by Avila, a nurse practitioner. During the examination, when questioned by Avila as to whether she had ever seen a "grownup's pee-pee," the victim stated that her "daddy has one" and, while pointing to her vaginal area, she said, "He put it there." The examination revealed no physical evidence of sexual abuse. However, Avila diagnosed the victim as "highly concerning for sexual abuse."

A police detective listened to the CARES examination from a separate room and talked with the medical staff and the victim's mother. He then contacted defendant at his place of work and had defendant come to the police station to discuss the allegations. During the interview, the detective explained that he had observed the CARES evaluation and informed defendant of what the victim alleged. Defendant told the officer that he did not know why his daughter made such statements, and stated that it was "a possibility that [she was] telling the truth" and that "he wouldn't do that to his daughter, but if she said it happened it probably did, but he [did not] remember doing that."

At the conclusion of the interview, defendant was arrested and eventually charged with first-degree rape and first-degree sexual abuse. In its case-in-chief, the state offered testimony from Avila regarding her diagnosis and its basis. Defendant objected to that testimony:

"Q   * * * And are those things you just described, the spontaneous nature [of the victim's statements], her pointing and gesturing, are those things that factor into your diagnosis?

"A   Yes.

"Q   Tell the Court why.

"[DEFENSE COUNSEL]:   Object as to a diagnosis, Your Honor. There is no—

"THE COURT:   Overruled.

"Q   * * * Tell the Court why.

"A   The way in which a child makes a disclosure has a lot to do with the diagnostic process. When kids are interviewed in a neutral way, the way we do them at CARES, and they—they are more likely to say things spontaneously. She gave, you know, a fair amount to detail for a three-year-old, which makes—which makes it more—it just is more believable.

"[DEFENSE COUNSEL]:   Object. Opinion evidence.

"THE COURT:   Overruled.

"THE WITNESS:   And again the spontaneity is a big part of incorporating that into a diagnosis rather than in response to lots of questions, and kids who—who are asked a lot of leading questions might tend to agree with adults when they're that age, but she wasn't asked leading questions, and she said some of these things very spontaneously. So that's—that's definitely taken into account when making a diagnosis.

"Q   * * * Okay.

"A   It's assumed that when a medical provider is seeing a child or an adult and they understand that's why they're there, that the information that they give you is—is true because they don't really have any reason to go to the doctor and make up stories, even with a child as young as three.

"[DEFENSE COUNSEL]:    Object, calls for speculation.

"THE COURT:    Overruled.

"* * * * *

"Q    Okay. Ms. Avila, based on your training and experience, your 20 years [as a] nurse practitioner, your ten years specializing in pediatric child abuse medicine, based on your training and experience, your evaluation of [the victim] and—were you able to make a diagnosis in this case?

"A    Yes, I was.

"Q    And are you able to make that diagnosis with a reasonable degree of medical certainty?

"A    Yes.

"Q    What is that diagnosis.

"[DEFENSE COUNSEL]:    And Your Honor, I'm going to object as to scientific evidence, and there's no foundation for this.

"THE COURT:    Overruled. Go ahead.

"THE    WITNESS:    Highly    concerning    for    sexual abuse."

After the parties had concluded their questioning of Avila, the court itself questioned her about the diagnosis:

"Q    Your diagnosis was highly concerning for sexual abuse, you didn't actually diagnose sexual abuse?

"A    Well, we have a kind of continuum in how we diagnose and in order to be consistent, and you know, and between examiners, we have a—I wish I had it here. I don't know if I do, but kind of a continuum. Things like pregnancy and certain sexually transmitted infections are considered diagnostic, and then vague behaviors might be suspicious or concerning, but not highly concerning, and then when you have very, very clear spontaneous disclosures from a child who is only three, I consider that highly, highly—

"Q    Okay. So there's a continuum of—

"A    Right.

"Q   —Sexual abuse—

"A   Right."

Avila clarified, in response to the court's questions, that her diagnosis was "highly concerning for sexual abuse" rather than simply "sexual abuse" because there "wasn't a sexually transmitted disease or pregnancy" or other physical evidence.

The state also offered, in its case-in-chief, testimony from the family friend to whom the victim initially made her disclosures, the officer who interviewed defendant, a social worker from the Department of Human Services who was involved with the family as a result of the allegations, and the victim herself. Defendant testified in his own defense that no sexual contact had occurred. He also indicated that, during the interview with the police detective, he had been pressured to admit to the abuse but had told the officer that he "had no recollection of that happening." In addition, defendant presented testimony from the police detective, several character witnesses, a pediatrician who had treated defendant's daughters over the years for a skin condition in their genital areas, and a psychologist who had examined defendant with regard to his suggestibility and compliance.

After deliberating, the trial court found defendant guilty of first-degree rape and sexual abuse. In announcing its verdict, the court discussed the evidence presented and emphasized defendant's statements to police:

"Regarding [the witness] from the Department of Human Services, everything she said is correct if you accept the premise that the child was abused, and human nature is—and I'm talking about mom at this particular point—when you love somebody, you don't just stop loving them immediately and say they're a terrible bad person. Human nature just doesn't work that way. It's—you don't go from 60 to 0 immediately, much less from 60 one direction to 60 miles per hour the opposite direction just in a second. Life just doesn't work that way.

"The child did testify and there was nothing to me that indicated that she had been subjected to any kind of coercion. Based on the way the mom presented herself both in the telephone calls to the jail and the way she testified, she

was on the fence. It's human nature to be on the fence in a case like that. She tried to be fair to both her husband and her child so I credit her for that.

"[The detective], it's interesting to me that no matter what a suspect does, you can spin it to make it—make him look guilty. There w[ere] some things that [the detective] took as indications of guilt or deception, which to me seemed that they could just was well have been reaction[s] of a perfectly innocent—innocent, honest person.

"* * * * *

"He, [the detective], had already observed the CARES interview, and he'd made up his mind that the abuse had occurred and he was there to get a confession. He used a conciliatory manner. He described it as sort of like a counselor, and of course, a counselor probably doesn't go in with an objective or goal, but in terms of the manner and techniques, that's exactly what he did; he didn't browbeat [defendant] and he didn't call him a scumbag or anything like that, but he was there to get a confession, he did everything he could to get a confession, and in that conciliatory manner he put a lot of pressure on [defendant] to confess.

"It was clear that [defendant] did not want to confess, and ultimately he didn't confess.

"Getting to [defendant], he admitted to the police that if [the victim] said it happened then it probably happened, and I think [the prosecutor] was correct in her closing remarks in that this was a very important point because it's something even the mom agrees with, that [the victim] said something happened, something happened, and in her phone call to [defendant], she encourages him to determine what really happened. It wasn't that something didn't happen, it was that something did, and he needs to get his mind straight as to exactly what it was.

"And [defendant] was not easily led either in his conversations with the police or especially in his trial testimony.

"[The family friend] was pretty straightforward. I think she just told things pretty much as they happened.

"And [the victim], a very young child, but bright, the rare four-year-old to be competent to as a witness, but much as Ms. Avila, the nurse practitioner indicated, she was a

rare four-year old, she had certain limitations in her mastery and understanding of numbers and of language to some extent, but she spontaneously said what happened.

"It does come back to me to [defendant] particularly admitting that—or stating that if [the victim] said something happened, something happened. He didn't say that nothing happened, he didn't say that * * * maybe she believed that something happened, he said 'If she said something happened, something happened,' and I believe that I'm convinced beyond a reasonable doubt that there was at least one incident as described by [the victim] to [the family friend] and the nurse practitioner Avila. And for that reason, I am required to find [defendant] guilty * * *."

On appeal, defendant contends that the trial court erred in admitting Avila's diagnosis because, among other things, the diagnosis was an improper comment on the victim's credibility. The state responds that, because the "diagnosis only assisted, and did not supplant, the trier of fact's credibility determination, the diagnosis did not constitute an improper comment on credibility." (Boldface omitted.) According to the state, in the absence of an explicit opinion regarding the victim's credibility, the diagnosis is not "an impermissible comment * * * on the credibility of the victim simply because * * * an inference [that the nurse believed the victim's report] is *available*." (Emphasis in original.) We conclude that defendant's characterization of the diagnosis in this case is correct.

■     We recently addressed this issue in *State v. Bainbridge*, 238 Or App 56, 241 P3d 1186 (2010). In that case, we concluded that, in light of the Supreme Court's decision in *State v. Lupoli*, 348 Or 346, 234 P3d 117 (2010),[1] a diagnosis of child sexual abuse made in the absence of physical evidence constitutes an impermissible comment on the credibility of a witness:

"In [*Lupoli*], the court held that an expert's diagnosis of child sexual abuse in the absence of physical evidence, 'necessarily was based on her assessment of the child's

---

[1] We note that *Lupoli* involved testimony from CARES nurse practitioner Avila very similar to the testimony from Avila in this case. 348 Or at 353-54; *see id.* at 361-62.

believability.' [348 Or] at 362. A diagnosis based purely on an assessment of the victim's credibility, the court held, amounts to impermissible vouching. *Id.* at 361-62."

*Bainbridge*, 238 Or App at 59. We determined that, pursuant to *Lupoli*, even where the expert has not explicitly vouched for the victim's credibility, in the absence of physical evidence, the diagnosis "necessarily was based on [an] assessment of the child victim's credibility" and, accordingly, could not properly be admitted into evidence. *Id.*

That rule controls in this case. Avila's diagnosis was made without any physical evidence of abuse and was necessarily based on her belief that the victim was telling the truth. Thus, pursuant to *Lupoli* and *Bainbridge*, the diagnosis constituted impermissible vouching and, as such, should not have been admitted.

■ Nevertheless, the state points out that "defendant was tried to the court and not a jury" and urges that, pursuant to *State v. Cafarelli*, 254 Or 73, 76, 456 P2d 999 (1969), "this court may presume that any impermissible comments on credibility would be ignored by the trial court." In that case, in examining asserted evidentiary errors, the court stated:

> "In a trial to the court we can assume that any questionable evidence would be disregarded. There is no indication that the court relied on the evidence in reaching the verdict of guilty. There was no need to rely on the questioned evidence."

*Cafarelli*, 254 Or at 76. It is upon that statement that the state relies in this case. However, in *State v. Marrington*, 335 Or 555, 73 P3d 911 (2003), the court limited the applicability of that portion of *Cafarelli*.

In *Marrington*, in a trial to the court, testimony was admitted that delayed reporting was a "predominant feature of child sexual abuse[.]" 335 Or at 564. The court concluded that the state had an obligation to demonstrate that that evidence was scientifically valid and that the trial court erred in admitted such evidence without a proper foundation. Pointing to *Cafarelli*, the state urged that there was no need to reverse the defendant's conviction and that, " 'in a trial to the

court, evidentiary error is presumed harmless in the absence of an affirmative indication that the court actually relied on the erroneously admitted evidence.' " *Marrington*, 335 Or at 564. The court disagreed:

> "It may be that the foregoing statement in *Cafarelli* describes a rule of appellate review that is applicable in the appropriate case. We have no occasion in this case, however, to undertake an extensive analysis of its origin or the appropriateness of its application in criminal cases. Nonetheless, suffice it to say that, if carried to its logical extreme, that rule—if that is indeed what it is—would obviate the need to conduct any other kind of harmless error analysis. That cannot be true in all cases. If, for example, the erroneously admitted evidence had been crucial to a particular outcome in a case, then some further analysis must be undertaken."

*Id.* at 565. The court went on to explain why, in that case, the erroneously admitted evidence necessitated reversal of the conviction, notwithstanding the fact that the defendant had a court trial:

> "The state argues that, at most, the erroneously admitted evidence * * * was relevant only to the trial court's credibility assessment and that '[n]othing in the court's remarks should lead this court to conclude that the admission of [the] testimony, if erroneous, had any impact on the trial court's decision-making [process].'

> "We disagree with the state's assertion that, in this case, the trial court's failure to mention [the] testimony in its remarks surrounding the announcement of its decision should play some role in our assessment of the impact of the erroneously admitted evidence. This case involved a swearing contest. *The victim claimed that there had been sexual contact in the form of inappropriate touching; defendant denied that it had occurred. There were no other witnesses to the touching, and there was no physical evidence of any kind that corroborated the alleged abuse.*"

*Id.* at 565-66 (first and third alterations in original; emphasis added). In light of those circumstances, and the fact that "there [was] nothing in the record to indicate that the testimony played *no role* in the trial court's assessment[,]" *id.* at

566 (emphasis added), the court concluded the error was not harmless and reversed.

In this case, the trial court did not specifically discuss Avila's diagnosis in the remarks surrounding its verdict. However, as in *Marrington*, that does not mean the court did not consider the evidence. This was a very close case and, ultimately, came down to a "swearing contest" in which the court had to decide whether to believe the testimony of the victim, who was four years old at the time of trial, that defendant had subjected her to sexual contact, or defendant, who denied the contact. As the trial court noted, due to her very young age, the victim had limitations on her communication skills. Also, like in *Marrington*, there were no witnesses to the sexual contact, and there was no physical evidence of abuse. The diagnosis that the victim had been abused went to the key issue in the case, and we note that the trial court specifically questioned Avila regarding her diagnosis, providing some indication that it considered that information to be important. Ultimately, taking all the circumstances into account, we cannot conclude that the erroneously admitted evidence was unlikely to have affected the court's verdict. *See id.*

In light of that conclusion, defendant's convictions must be reversed and the case remanded for a new trial. Accordingly, we do not reach defendant's other arguments.

Reversed and remanded.