Argued and submitted September 28, 2010, in case A133760,
reversed and remanded; in case A133761, affirmed May 25, 2011,
petition for review denied February 2, 2012 (351 Or 545)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MICHAEL LOUIS FREITAS,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR9900485, CR0501224;
A133760 (Control), A133761

259 P3d 46

Susan Fair Drake, Senior Deputy Public Defender,
argued the cause for appellant. With her on the briefs was
Peter Gartlan, Chief Defender, Office of Public Defense
Services.

Matthew J. Lysne, Assistant Attorney General, argued the cause for respondent. On the briefs were John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Rene C. Holmes, Senior Assistant Attorney General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Senior Judge.

ROSENBLUM, S. J.

## ROSENBLUM, S. J.

Following a consolidated jury trial involving defendant's daughter B and his daughter C, defendant was convicted: in the case involving B, A133760, of two counts of rape in the first degree, ORS 163.375, and three counts of sexual abuse in the first degree, ORS 163.427; in the case involving C, A133761, of 14 counts of rape in the first degree, ORS 163.375, six counts of sodomy in the first degree, ORS 163.405, and one count of unlawful sexual penetration in the first degree, ORS 163.411. On appeal, defendant contends that it was plain error, under *State v. Southard*, 347 Or 127, 218 P3d 104 (2009), and *State v. Lupoli*, 348 Or 346, 234 P3d 117 (2010), for the trial court to have admitted, as to B, an expert diagnosis of sexual abuse and testimony explaining that diagnosis.[1] We agree, and we exercise our discretion to correct the error with respect to the convictions in A133760 (relating to B). C, however, never underwent an evaluation for sexual abuse, thus, no diagnosis of such abuse of C was ever made. For the reasons explained below, we affirm the convictions in A133761 (relating to C).

In *Southard*, the Supreme Court determined that the probative value of a medical professional's diagnosis of child sexual abuse, in the absence of physical evidence of abuse, was substantially outweighed by the danger of unfair prejudice to the defendant. 347 Or at 139-43. In particular, the court held that "where, as here, that diagnosis does not tell the jury anything that it could not have determined on its own, the diagnosis is not admissible under OEC 403." *Id.* at 142. The court later held, in *Lupoli*, that an expert's diagnosis of child sexual abuse, in the absence of physical evidence, "necessarily was based on her assessment of the child's believability," and that the testimony explaining that diagnosis amounted to impermissible vouching as to the victim's credibility. 348 Or at 362-63.

In this case, the state's evidence included testimony by Dr. Keltner, a doctor at a child abuse assessment program known as CARES, that, although B showed no physical signs

---

[1] Defendant makes a number of other assignments of error that we reject without discussion.

of abuse, she was diagnosed as having been sexually abused. Both Keltner and Kernan, a forensic child interviewer at CARES, testified that B's diagnosis was based, in pertinent part, on aspects of B's narrative during her CARES evaluation, which led them to believe that B was being truthful.

That testimony falls squarely within the holdings in *Southard* and *Lupoli*. Because the diagnosis and the medical professional's explanations of its basis related directly to the credibility of B, who also testified at trial, we exercise our discretion to correct that error by reversing the convictions in A133760, for the reasons set forth in *State v. Gonzales*, 241 Or App 353, 359-61, 250 P3d 418 (2011), *State v. Merrimon*, 234 Or App 515, 522, 228 P3d 666 (2010), *State v. Lovern*, 234 Or App 502, 513-14, 228 P3d 688 (2010), and *State v. Clay*, 235 Or App 26, 230 P3d 72 (2010).

Given that conclusion, a question remains: Does the erroneous admission of evidence relating to B also require reversal of defendant's convictions relating to C? Defendant argues that we should reverse all the convictions stemming from his consolidated trial. Although the record clearly establishes that the error requires reversal of the convictions involving B, the evidence also demonstrates that the improperly admitted expert testimony likely did not affect the jury's decision to convict defendant of the charges involving C, who was not diagnosed as having been sexually abused. Thus, in exercising our discretion to correct the error in this case, we reverse only defendant's convictions relating to the offenses involving B. We otherwise affirm.

A lengthy discussion of the facts relating to the abuse of B is not necessary. However, we do need to relate the pertinent facts in the case involving C. Unlike B—who lived with defendant for only a few months and who, upon moving out, immediately disclosed the abuse—defendant's older daughter, C, and her brother were raised exclusively by defendant until C was 12 years old.[2] The family moved frequently—almost every year—while the children were growing up, and, because of that living situation, C testified that "I couldn't ever keep my friends," and that, during her

---

[2] C and her brother were defendant's children by a different mother than B.

childhood, there were no other adults in her life she felt she could trust other than defendant.

C did not disclose sexual abuse to anyone when she was a child, and, in fact, told a detective in 1998, who was investigating B's disclosures of sexual abuse by defendant, "that she had heard what [B] was saying about her dad[,]" that it was "all lies," and when asked, stated that she had never been sexually abused by defendant. However, C was taken to live with her mother soon after that interview, and when she was 18 and had lived outside defendant's home for around six years, she disclosed to a friend that defendant had actually been "raping me since I can't really remember when." C's friend prompted her to disclose the abuse to the police in June 2005 and, based on C's disclosures, defendant was charged (in a separate case from the one involving B) with 16 counts of first-degree rape, six counts of first-degree sodomy, and two counts of first-degree unlawful sexual penetration of C.

At the time C made her disclosures, defendant was still evading police attempts to arrest him on a 1999 warrant for the charges involving B. Defendant was finally apprehended and arraigned in both cases in July 2005. At the consolidated trial in 2006, B and C each testified as to her own abuse. Importantly, neither victim testified about any first-hand knowledge of abuse of the other victim, nor did any of the diagnostic evidence involving B discuss or relate to C; indeed, it is clear from the record that B was never aware that C may have been abused until 2005. C, in particular, gave extensive and emotional testimony at trial regarding her own abuse. C testified that she first remembered defendant holding her down while he penetrated her bottom with his penis when she was four years old, and that she first remembered defendant entering her vaginally when she was eight. C recalled defendant having had sexual intercourse with her at least 10 but likely more than 15 times between the time she was four and 10 years old, and that defendant had had intercourse with her with more frequency from the time that she was 10 until she moved out of defendant's home when she was 12. She also described other conduct that

occurred during those years, which included defendant penetrating her vagina with his fingers, touching her breasts, and having her put her mouth on his penis.

C testified that, on one occasion when she was 12, immediately prior to moving in with her mother, defendant had attempted to engage in sexual contact with her in a tent at a family gathering. That testimony was corroborated by two other witnesses, Scott and her ex-husband J. Freitas, who testified that, from outside the tent that night, Scott had overheard defendant say to C, "My balls are heavy. My dick is hard. I need you. I want you." Even after C moved out of defendant's home, she occasionally had contact with defendant during visits to her paternal grandparents'—where defendant had been hiding to evade police attempts to serve him with the warrant in B's case—and C continued to be subject to abuse by defendant on those visits. C testified that defendant told her that, if she ever disclosed any abuse, she and her brother would be split up and put in foster care. C testified that she finally decided to disclose the abuse to her friend in 2005, because that friend "was the first person that ever came into my life that I completely could trust * * * [s]o it felt right to tell her," and that since disclosing the abuse, she had been excommunicated from her paternal family. C's friend and a police officer to whom C had later reported the abuse also testified at trial.

Finally, the state presented expert testimony by Kernan that it is common for a child to delay disclosing acts of abuse and that many children do not disclose during their childhood that they have been sexually abused. Kernan gave a number of reasons why children may delay disclosure or initially deny abuse, including feelings of isolation, threats by the abuser, or a child's beliefs that what has happened is normal for other families.

Defendant's theory was to deny that any of the abuse had occurred. With regard to C, the case by the defense consisted of testimony by C's brother, defendant's three siblings, and a friend of defendant's, to the effect that none of them had witnessed or suspected abuse of C.

Considering those facts in their entirety, we conclude that the erroneously admitted testimony was not pertinent to the charges related to abuse of C. Rather, B's disclosures to CARES staff, which formed the basis of the erroneously admitted testimony, gave rise only to the charges for abuse of B. Regarding C, the state relied on C's own in-depth and emotional testimony, other testimony that corroborated C's allegations, and Kernan's testimony explaining why it is common for children like C to delay disclosure of, or to even initially deny but later disclose, childhood sexual abuse.[3] In other words, the state's case as it related to C would not have been different had the inadmissible evidence been excluded. *See State v. Cox*, 337 Or 477, 500-01, 98 P3d 1103 (2004), *cert den*, 546 US 830 (2005) (declining to exercise discretion to review unpreserved error where state's case would not have changed had defendant raised a timely objection).

Defendant cites *Southard* in support of his contention that, regardless of the differences between the import of the erroneously admitted evidence with regard to the charges involving B as opposed to C, we should reverse all his convictions involving both victims. According to defendant, *Southard* instructs that the admission of a diagnosis of sexual abuse as to one victim will always create a substantial risk that the jury will defer to that diagnosis in judging the credibility of *all* the victims in a case.

*Southard* does not support the conclusion that defendant suggests. In *Southard*, the court overturned the defendant's convictions for three counts of sodomy, two involving a brother and one involving his three-year-old sister, even though only the brother was diagnosed as having been sexually abused. *See* 347 Or at 132, 143. The court did

---

[3] Kernan's specific statements regarding delayed disclosure could only have been understood to apply to C, considering that B immediately disclosed her allegations of abuse to her mother. These statements were, thus, admissible as to the charges alleging abuse of C and were not part of the erroneously admitted expert testimony. *Lupoli*, 348 Or at 362 (expert testimony that can "be meaningfully separated from the context" of explaining a diagnosis of sexual abuse may be admissible); *State v. Perry*, 347 Or 110, 122, 126, 218 P3d 95 (2009) (holding evidence admissible that some children who have been abused may delay disclosing abuse, when presented to disprove a claim that delay in reporting demonstrates that no abuse occurred).

not discuss why it reversed the defendant's conviction regarding the sister. The court did make clear, however, that the doctor who diagnosed the brother as having been sexually abused relied on all the brother's disclosures to CARES staff, which included detailed descriptions of multiple, specific instances of abuse of the sister. *Id.* at 131-37. When determining whether to credit the boy's reports of abuse, the CARES staff considered whether, in detailing both his own and his sister's abuse, the boy "had used age-appropriate terms to describe the abuse, whether he had provided specific details, and whether the events that he had described were consistent with other historical facts." *Id.* at 131. Because the expert diagnosis at issue in *Southard* relied on the brother's detailed descriptions of both his own and his sister's abuse, the risk of prejudice that was of concern in *Southard*—that the diagnosis may have caused the jury to inappropriately defer to the expert's implicit conclusion that the brother's reports of abuse were credible—inhered in the jury's disposition of the charges relating to both victims in that case. *See also Merrimon*, 234 Or App at 522 (overturning both endangering welfare of a minor charge and first-degree sexual abuse charge where victim's disclosures to CARES staff included statements that presumably formed the basis for both charges).

This case, in that regard, is distinguishable from *Southard*. Here, B's disclosures of abuse to CARES staff did not include any mention of C, whose abuse B was not aware of at the time. As a result, neither the expert diagnosis nor the "vouching" for B's credibility presented a substantial risk that the jury was prejudiced by that testimony in evaluating the credibility of *both* B and C. Given that the erroneously admitted expert testimony about B did not rely upon or otherwise comment on C's claims of abuse, there is no evidence to support a conclusion, on plain error review, that the experts' testimony likely " 'dissuad[ed] the jury from exercising its own independent judgment' " about the credibility of C. *Southard*, 347 Or at 142 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, 3 *Federal Evidence* § 7:9, 810-13 (3d ed 2007)). Further, we find no other indication in the record that defendant's convictions for the abuse of C were based on

B's testimony, or on the erroneously admitted expert testimony. *Southard*, therefore, does not require reversal of the charges as to both victims. Given the weight of the evidence in C's case, and in keeping with the discretion afforded us under plain error review, we conclude that the convictions relating to C should be affirmed.

In case A133760, reversed and remanded. In case A133761, affirmed.